UNITED COOPERATIVE, Plaintiff,

v.

FRONTIER FS COOPERATIVE, Defendant-Appellant,

RURAL MUTUAL INSURANCE COMPANY, National
Farmers Union Property and Casualty Company
and Tri-State Insurance Company of Minnesota,
Defendants-Respondents.†

Court of Appeals

*No. 2006AP2704. Submitted on briefs May 7, 2007.
—Decided July 12, 2007.*

2007 WI App 197

(Also reported in 738 N.W.2d 578.)

† Petition to review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James F. Gebhart* and *H. Dale Peterson* of *Stroud, Willink & Howard, LLC*, Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Mark Frankel* of *LaFollette Godfrey & Kahn*, Madison, and of counsel *Beth Ann Berger-Zerman* of *Bollinger, Ruberry & Garvey*, Chicago, Illinois, and *Mark W. Andrews* of *Winner Wixson & Pernitz*, Madison, and *David Hanus* and *Thomas R. Schrimpf* of *Hinshaw & Culbertson LLP*, Milwaukee.

Before Lundsten, P.J., Vergeront and Bridge, JJ.

¶ 1. LUNDSTEN, P.J. This is a review of summary judgment in which the circuit court dismissed the insurers of the defendant, Frontier FS Cooperative, from a breach of contract action brought by plaintiff United Cooperative. On appeal, the appellant is Frontier and the respondents are the insurers.

¶ 2. United's claim against Frontier arises out of alleged environmental contamination on property that Frontier sold to United. Frontier and its insurers dispute coverage based on a number of provisions in Frontier's insurance policies. The parties dispute whether United's complaint sufficiently alleges an "occurrence," thus establishing an initial grant of coverage under the policies. The parties also dispute whether, assuming there is an initial grant of coverage, certain exclusions remove coverage. The disputed exclusions include an "owned property" exclusion, a "contractually assumed liability" exclusion, and a "pollution" exclusion.

¶ 3.   We conclude that United's complaint sufficiently alleges an occurrence, thus establishing an initial grant of coverage. We further conclude, based in part on a concession by Frontier, that the owned property exclusion removes coverage, except relating to groundwater contamination. In addition, we determine that the contractually assumed liability exclusion does not apply. We also conclude, based on another concession by Frontier, that the pollution exclusions in some of the policies remove coverage under those policies. We reverse the circuit court's order for summary judgment and remand for further proceedings.[1]

## *Background*

¶ 4.   According to the allegations in United's complaint, Frontier and United entered into a sales contract that transferred real estate and equipment from Frontier to United.[2] As part of the contract, Frontier warranted that it had never used the property for certain activities, each of which might cause soil or groundwater contamination. For example, Frontier warranted that it had never used the property "[i]n a manner requiring the issuance of a permit covering the discharge or disposal of a pollutant or waste into any waters, groundwaters, or aquifer." Frontier further warranted that there was no "release or substantial

---

[1] The insurers filed a joint brief. We refer to them collectively, except when we find it necessary to do otherwise.

[2] The parties' briefs indicate that the sale actually occurred between Frontier's and United's predecessor entities, and that the insurance policies in this case were issued to Frontier's predecessors. The parties do not suggest that this fact affects any issue in this appeal. Accordingly, we simply refer to "Frontier" and "United" throughout this opinion, and we make no further reference to predecessor entities.

threat of a release of a hazardous substance, pollutant, or contaminant" that might be subject to regulation or might make United liable for a nuisance. Frontier also promised to "indemnify" United for any breach of warranty or claim arising out of Frontier's operations, including "environmental liability."

¶ 5. About fifteen years after the sale, United discovered significant soil contamination on the property. At the time the complaint was filed, United had already incurred over $600,000 in cleanup costs. In addition, United anticipated significant additional costs associated with groundwater assessment and continued cleanup of the property. United alleged that Frontier's "operations or conduct" on the property caused the contamination. After Frontier refused to pay United's cleanup costs, United sued Frontier and its insurers, alleging a breach of contract.

¶ 6. Frontier's insurers—Rural Mutual Insurance Company, Tri-State Insurance Company of Minnesota, and National Farmers Union Property and Casualty Company—had issued successive one-year policies.[3] The insurers moved for summary judgment, seeking a determination that Frontier's policies did not provide Frontier with coverage for United's breach of contract claim. The circuit court agreed with the insurers, and dismissed them from the action. Frontier appeals.

### Discussion

¶ 7. The circuit court granted summary judgment in favor of the insurers. We review summary judgment

---

[3] Rural insured Frontier from September 1, 1969, through September 1, 1981; Tri-State insured Frontier from August 1, 1981, through August 31, 1984; and National Farmers Union insured Frontier from August 31, 1984, through August 31, 1991.

*de novo,* applying the same standards as the circuit court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). A party is entitled to summary judgment if there is no genuine issue as to any material fact and that party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2005–06).[4] Although the posture of this case is summary judgment, the parties implicitly agree that all relevant factual allegations are contained in United's complaint. The only information they rely on outside the complaint is the content of the insurance policies. Under these circumstances, we confine our analysis to the factual allegations in the complaint, liberally construing those allegations in favor of coverage, and determine whether those allegations, if true, establish coverage under the policies. *See Doyle v. Engelke,* 219 Wis. 2d 277, 284, 580 N.W.2d 245 (1998); *Glendenning's Limestone & Ready-Mix Co. v. Reimer,* 2006 WI App 161, ¶ 41, 295 Wis. 2d 556, 721 N.W.2d 704.

¶ 8.   To determine whether coverage exists under a particular policy, we first ascertain whether the policy makes an "initial grant of coverage." *State Farm Fire & Cas. Co. v. Acuity,* 2005 WI App 77, ¶ 8, 280 Wis. 2d 624, 695 N.W.2d 883. "If an initial grant is triggered, we look to see if any exclusions apply." *Id.* We strictly construe exclusions against the insurer. *Id.*

¶ 9.   We must decide whether the circuit court, in granting summary judgment in favor of the insurers, correctly determined that none of Frontier's policies covered property damage caused by soil contamination that allegedly occurred while Frontier owned the prop-

---

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

erty now owned by United. Our analysis is in two parts. We first address whether the policies initially grant coverage. Because we conclude that there is initial coverage, we go on to address the effect of various exclusions.

## A. Whether The Policies Initially Grant Coverage

¶ 10.  The parties' dispute over whether the policies initially grant coverage hinges on whether there was an "occurrence" within the meaning of the policies. Although the parties do not frame their arguments as such, their "occurrence" dispute turns on which event is the pertinent event for purposes of determining whether there was an "occurrence" as defined by the policies. The insurers maintain that we should look to Frontier's refusal to comply with its indemnification obligation under its contract with United. Frontier argues that we should look to the soil contamination that allegedly occurred while Frontier owned the property.[5]

¶ 11.  The insurers argue that the pertinent event here is Frontier's refusal to indemnify United because it is the event that forms the basis of United's sole claim against Frontier. Moreover, the insurers say, this event cannot be an "occurrence" because an occurrence must be "accidental," and Frontier's refusal to indemnify

---

[5] We use the term "event" only to facilitate our discussion in this case. We do not mean to suggest that what constitutes an occurrence for purposes of an insurance policy is necessarily limited by an overly strict definition of "event." As we use the term here, for example, a continuous or repeated exposure to a condition could be an event. *See, e.g., Wisconsin Elec. Power Co. v. California Union Ins. Co.*, 142 Wis. 2d 673, 681, 419 N.W.2d 255 (Ct. App. 1987) ("[W]hile any part of the single injurious process continues, the occurrence continues.").

757

United was intentional. Although the policies vary somewhat, they all define an "occurrence" essentially as either an "accident" or something that is not "expected or intended."

¶ 12.   For the reasons that follow, we agree with Frontier that the pertinent event is the soil contamination that allegedly occurred while Frontier owned the property. And, in the absence of argument to the contrary, we conclude that the soil contamination is an "occurrence."

¶ 13.   Frontier's policies grant coverage for "all sums . . . which [Frontier] shall become legally obligated to pay as damages because of . . . *property damage . . . caused by an occurrence.*" (Emphasis added.) Obviously, Frontier's refusal to indemnify United is not a cause of the alleged property damage. Rather, the event that United alleges caused the property damage is the contamination of soil that United alleges occurred while Frontier owned the property. Applying the language in the policies to this event, we perceive no reason why the alleged contamination of soil is not a causal "occurrence." Notably, the insurers do not argue that the alleged contamination of the soil is not an "occurrence." Accordingly, we conclude that the policies initially grant coverage.

¶ 14.   Our analysis is consistent with the reasoning employed in *American Family Mutual Insurance Co. v. American Girl, Inc.*, 2004 WI 2, 268 Wis. 2d 16, 673 N.W.2d 65. In *American Girl*, the insured agreed to construct a warehouse for Pleasant Company. Under the terms of the contract, the insured warranted to Pleasant Company that the design and structural components of the warehouse would be free from defects and that the insured would be liable for any

consequential damages caused by any such defects. *Id.*, ¶ 11. When the completed warehouse became structurally unsound, Pleasant Company alleged that the insured breached the contract. Pleasant Company further alleged that a soil engineer's negligence was the underlying cause of the breach. *Id.*, ¶¶ 13–14, 17–18.

¶ 15. The insurer in *American Girl* argued that there was no "occurrence" within the meaning of the insured's commercial general liability (CGL) policy because Pleasant Company's claim against the insured was a breach of contract claim. The court rejected the insurer's assertion that "a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of [a] CGL's initial grant of coverage." *Id.*, ¶ 39. The *American Girl* court explained that nothing in the CGL's basic coverage language conditioned coverage for a loss on some "definitive tort/contract line of demarcation"; the policy did not define occurrence "by reference to the legal category of the claim." *Id.*, ¶ 41. We glean from *American Girl* that, in the absence of policy language specifically limiting coverage based on the type of legal claim giving rise to an insured's potential liability, the existence of an "occurrence" is determined by looking at the asserted cause or "factual basis" for alleged bodily injury or property damage, not by looking at the legal category of a claim against the insured. This reading of *American Girl* is in keeping with our reading of the case in *Glendenning's Limestone*, 295 Wis. 2d 556, where we stated that the correct occurrence "analysis focuses on the factual basis for the claim and not on the theory of liability." *Id.*, ¶ 25; *see also 1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, ¶ 58, 293 Wis. 2d 410, 716 N.W.2d 822 (the supreme court has "repeatedly

rejected the argument that insurance coverage is dependent upon the theory of liability").[6]

¶ 16.    The insurers' attempt to distinguish *American Girl* suffers the same defect as their argument that Frontier's alleged breach of contract is the pertinent event for purposes of determining whether there was an "occurrence." The insurers direct our attention to differences between the reason the insured in *American Girl* was allegedly legally obligated to pay damages (negligence) and why the insured here is allegedly obligated to pay (intentional failure to indemnify). As we have seen, however, the lesson taught by *American Girl* is that a proper "occurrence" analysis focuses on the event or series of events that allegedly caused the alleged bodily injury or property damage. Here, that event or series of events includes an "occurrence" within the meaning of the policies.

¶ 17.    The circuit court relied on *Everson v. Lorenz*, 2005 WI 51, 280 Wis. 2d 1, 695 N.W.2d 298, in holding that Frontier's alleged breach of contract—its failure to indemnify United—is not an "occurrence." In *Everson*, the supreme court held that a misrepresentation is not an "occurrence" within the meaning of a CGL

---

[6] Both parties refer to the insurance policies in this case as CGL policies, although the insurers also note that some of the policies are titled "country commodities distributor's policy" or "agri-business insurance plan." We understand such policies or "plans" to contain many of the same terms as standard CGL policies, along with additional or modified provisions. So far as we can discern, all of the provisions at issue here are routinely included in standard CGL policies. In any event, the insurers have not suggested that *American Family Mutual Insurance Co. v. American Girl, Inc.*, 2004 WI 2, 268 Wis. 2d 16, 673 N.W.2d 65, and the other cases we discuss are inapplicable because they pertain to CGL policies.

policy, at least not when the misrepresentation involves a "volitional act." *See id.*, ¶¶ 2–3, 18, 20. The circuit court characterized Frontier's failure to indemnify as a volitional act, not an accident, and concluded, based on *Everson*, that the failure was not an "occurrence." However, in *Everson* the parties expressly or implicitly agreed that the insured's misrepresentation was the pertinent event to analyze for purposes of determining whether there was an occurrence. Thus, the *Everson* court had no reason to address whether the misrepresentation was the only possible event for purposes of determining whether there was an occurrence. *Everson* does not provide guidance as to which event or events are pertinent for purposes of determining whether an "occurrence" is present when the parties dispute that topic.

¶ 18. Similarly, the other three cases relied on here by the circuit court and the insurers, *Smith v. Katz*, 226 Wis. 2d 798, 595 N.W.2d 345 (1999); *Benjamin v. Dohm*, 189 Wis. 2d 352, 525 N.W.2d 371 (Ct. App. 1994); and *Qualman v. Bruckmoser*, 163 Wis. 2d 361, 471 N.W.2d 282 (Ct. App. 1991), do not provide guidance as to which event is the pertinent event for purposes of determining whether there is an "occurrence." Like *Everson*, those cases all center around an alleged misrepresentation, but do not suggest that the misrepresentation was the only possible event for purposes of determining whether there was an occurrence.

¶ 19. The key to understanding why the analyses in *Everson*, *Smith*, *Benjamin*, and *Qualman* focused on an alleged misrepresentation by an insured, rather than on some other event that arguably caused the alleged property damage, is that the insureds in those cases were not responsible, or apparently not respon-

761

sible, for the true cause of the alleged property damage. So far as the decisions in those cases reveal, the insureds' misrepresentations were the only hooks on which the insureds seeking coverage could hang their hats if they hoped to obtain coverage. Further, to the extent the results in the four cases can be explained by a generalization, that generalization would seem to be this: When the asserted basis for an insured's liability is a misrepresentation, and the misrepresentation cannot be said to have caused any "property damage" (or bodily injury) as that term is defined in a typical CGL or other liability policy, the misrepresentation is not an occurrence and the insured will not have coverage.

¶ 20.   As in *American Girl,* here we look to whether some alleged event, other than a misrepresentation by the insured, was an "occurrence." We conclude that the alleged soil contamination that occurred while Frontier owned the property qualifies as an "occurrence." It follows that the insurers' policies provide an initial grant of coverage and we must turn our attention to the disputed policy exclusions.[7]

### B. Whether An Exclusion Removes Coverage

¶ 21.   Having determined that Frontier's policies trigger an initial grant of coverage, the question be-

---

[7] The insurers make two additional arguments for why there is no initial grant of coverage. First, they argue that the "triggering event" in this case occurred outside the policy periods. By "triggering event," the insurers mean the date that Frontier allegedly breached the contract. Second, the insurers argue that coverage is precluded by the "fortuity doctrine" and public policy. Both of these arguments are based on the premise that the pertinent event for purposes of determining the existence of an "occurrence" was Frontier's alleged breach of contract. Our rejection of this underlying premise disposes of these arguments.

comes whether one or more of the following exclusions remove coverage: an owned property exclusion; a contractually assumed liability exclusion; and, in some policies, a pollution exclusion. We analyze each exclusion separately.

### 1. Owned Property Exclusion

■

¶ 22.   Each  of  Frontier's  policies  contains  an owned property exclusion that removes coverage for damage to "property owned" by the insured. The circuit court  concluded  that,  even  if  the  policies  initially granted coverage, this owned property exclusion removed it. We agree with the circuit court to the extent that United is seeking to recover for the expense of cleaning up "owned property" solely for the sake of that owned property. As the insurers point out, Frontier does not argue otherwise.[8] However, to the extent United is seeking to recover the expense of cleaning up owned property in order to address damage to groundwater, we disagree with the circuit court.

¶ 23.   Frontier  asserts  that  it  never  owned  the groundwater because groundwater is owned by the public. *See, e.g., Robert E. Lee & Assocs., Inc. v. Peters*, 206 Wis. 2d 509, 522, 557 N.W.2d 457 (Ct. App. 1996)

---

[8] Frontier does not argue that the contamination of anything other than groundwater survives the owned property exclusion. The following passage from Frontier's brief-in-chief is representative:

> Frontier's position, both in its summary judgment brief and in oral argument [before the circuit court], was and is that groundwater is not property owned by a landowner, and that contamination of groundwater therefore would not be excluded from coverage under a CGL policy by any "owned property" exclusion, regardless whether the contamination was on-site or off-site.

("Groundwater contamination is damage to public property rather than property owned by an individual."). Whether viewed as a factual or legal matter, the insurers do not dispute that groundwater is owned by the public. And, as we shall see, United's complaint seeks, at least in part, compensation for the cost of cleanup necessary to address the contamination of groundwater.

¶ 24. Thus, the question is whether the owned property exclusions in the policies here remove coverage for damage to groundwater. The readily apparent answer to this question is "no" because the owned property exclusions here remove coverage only for damage to "property owned" by the insured, and the insurers have conceded that groundwater is not owned by the insured. The insurers' success in persuading the circuit court otherwise largely hinged on *State v. City of Rhinelander*, 2003 WI App 87, 263 Wis. 2d 311, 661 N.W.2d 509. Accordingly, we turn our attention to that decision.

¶ 25. In *City of Rhinelander*, we held that an owned property exclusion barred coverage for the cost of remediating damage to groundwater. *See id.*, ¶¶ 6–7, 11–13. But the owned property exclusion at issue was markedly different from the exclusion here; it broadly removed coverage for "*property damage arising out of* . . . property damage to property . . . owned by" the insured. *Id.*, ¶ 6 (emphasis added). Thus, the damaged groundwater was excluded because it was *property damage arising out of* property damage to owned property. *Id.*, ¶¶ 11–13. In contrast, the exclusions in the policies here simply remove coverage for damage to property owned by the insured. Accordingly, the circuit court's reliance on *City of Rhinelander* was misplaced.

¶ 26. Still, the insurers argue that United's complaint fails to clearly allege damage to groundwater. We disagree.

¶ 27. Attached to and incorporated in the complaint is the contract between Frontier and United. The complaint highlights the fact that in this agreement Frontier warranted that no portion of the property had ever been used "[i]n a manner requiring the issuance of a permit covering the discharge or disposal of a pollutant or waste into any . . . groundwaters." The complaint further alleges:

> In June 2004, United began a construction project on the subject property that revealed for the first time significant soil contamination that, to date, has cost United well over $600,000 to clean-up. *Further, United anticipates significant additional costs associated with a necessary groundwater assessment and continued clean-up of the subject property.*

(Emphasis added.) The reference to "necessary groundwater assessment," combined with the reference to the warranty that no pollutant or waste was discharged or disposed "into any . . . groundwaters," reasonably informs the reader that at least one purpose of the soil contamination cleanup is remediating corresponding damage to groundwater, which must be assessed to determine the extent of any damage to the groundwater and whether the cleanup is having its intended effect on such groundwater.

¶ 28. In sum, the complaint alleges damage to groundwater and, because groundwater is not "owned property," the owned property exclusions applicable here do not remove coverage for groundwater contamination. Of course, if, following remand, further submissions reveal that it is undisputed that United seeks damages relating only to owned property, the insurers

may renew their motion for summary judgment if permitted by any applicable scheduling order.[9]

## 2. Contractually Assumed Liability Exclusion

¶ 29. Frontier's policies contain "assumed liability" exclusions. With certain exceptions not material here, the exclusions remove coverage for "liability assumed under any contract." The insurers argue that the circuit court correctly concluded that, even if the policies initially granted coverage, these exclusions removed it because the liability at issue was contractually assumed by Frontier.

¶ 30. The property sales contract between Frontier and United contains language in which Frontier warranted that the property had never been used for a variety of activities which might cause soil or groundwater contamination. Frontier further warranted that there had been no "release or substantial threat of a release of a hazardous substance, pollutant, or contaminant" that might be subject to state or federal regulation or might make United liable for a nuisance. In effect, Frontier warranted that it was selling pollution-free property to United.[10]

---

[9] We note that the facts in this case may be somewhat unusual in that the non-owned property, the groundwater, likely permeates the "owned property" excluded under the policy. One dictionary defines groundwater as "water in the zone of saturation where all openings in rocks and soil are filled." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1004 (unabr. ed. 1993).

[10] The contract contains qualifying language—"to the best of Seller's knowledge." Neither party suggests that this qualifying language has any significance for purposes of the current dispute.

¶ 31. The contract also specifies a remedy should the property prove to be polluted. The contract requires Frontier to "indemnify" United for "environmental liability" resulting from Frontier's operations on the property. In this respect, the contract reads:

> 3.8 Indemnification. Seller agrees to indemnify and hold Buyer harmless from any and all loss or additional expense resulting from any ... *breach of warranty or claim arising out of the business operations carried on by Seller prior to the closing* .... It is agreed that Seller's liability to indemnify Buyer for any environmental liability arising out of pollution, hazardous waste, or other environmental liability, be limited to indemnification for discharges occurring during the time which Seller owns the subject premises, or for breach of any ... warranty given by Seller to Buyer under this agreement .... Nothing in this contract shall be construed to reduce Seller's liability for environmental cleanup, pollution or toxic waste discharge, that is otherwise imposed by operation of law.

(Emphasis added.)

■

¶ 32. The insurers argue that, if Frontier had not assumed the obligation to "indemnify" United under the contract, Frontier would have no liability to United. Thus, according to the insurers, the contractually assumed liability exclusion applies because Frontier contractually assumed an indemnity liability. We conclude that this argument is inconsistent with *American Girl*.

¶ 33. The *American Girl* court explained that contractually assumed liability exclusions do not apply to all liability arising out of a contract. Thus, in *American Girl*, although the insured contractually assumed the obligation to deliver a non-defective ware-

767

house, that contractual obligation was not an "assumed liability" within the meaning of the policy. The *American Girl* court explained:

> "The key to understanding this exclusion . . . is the concept of liability assumed." As one important commentator has noted,
>
>> Although, arguably, a person or entity assumes liability (that is, a duty of performance, the breach of which will give rise to liability) whenever one enters into a binding contract, in the CGL policy and other liability policies an "assumed" liability is generally understood and interpreted by the courts to mean the liability of a third party, which liability one "assumes" in the sense that one agrees to indemnify or hold the other person harmless.
>
>> The term "assumption" must be interpreted to add something to the phrase "assumption of liability in a contract or agreement." Reading the phrase to apply to all liabilities sounding in contract renders the term "assumption" superfluous. We conclude that the contractually-assumed liability exclusion applies where the insured has contractually assumed the liability of a third party, as in an indemnification or hold harmless agreement; it does not operate to exclude coverage for any and all liabilities to which the insured is exposed under the terms of the contracts it makes generally.
>
>> . . . The relevant distinction "is between incurring liability as a result of a breach of contract and specifically contracting to assume liability for another's negligence."

*American Girl*, 268 Wis. 2d 16, ¶¶ 57–59 (citations omitted).

¶ 34. Here, Frontier did not "contractually assume[] the liability of a third party." *See id.*, ¶ 58. Rather, as did the insured in *American Girl*, Frontier

768

assumed the obligation to deliver a non-defective item, namely, non-polluted land. Furthermore, like the insured in *American Girl*, Frontier is not liable *only* because it assumed a liability held by another, "specifically contract[ed] to assume liability for another's negligence," or agreed to "indemnify" or "hold harmless" another, at least not as those phrases are used in *American Girl. See id.*, ¶¶ 57–59.

¶ 35. The insurers argue that if the "assumed liability" exclusion does not remove coverage, they may be unfairly strapped with coverage obligations for risks they did not contemplate or underwrite or for which they did not receive a premium. *See id.*, ¶ 23. We disagree. The insurers agreed to provide coverage for "all sums . . . which [Frontier became] legally obligated to pay as damages because of . . . property damage . . . caused by an occurrence." As explained above, viewing the allegations in the complaint most favorably to Frontier, there was an event during the time Frontier owned the property that qualifies as an "occurrence," and that occurrence caused property damage to groundwater owned by someone other than Frontier. The resulting liability is not one that Frontier assumed from United. Therefore, in concluding that the assumed liability exclusion does not apply, we are not interpreting the policy to provide coverage for a risk that the insurers did not contemplate or underwrite or for which they did not receive a premium.

### 3. Pollution Exclusion

¶ 36. Some of Frontier's insurance policies with National Farmers contained a pollution exclusion which removes coverage for property damage "arising out of the actual, alleged, or threatened discharge, dispersal, release, or escape of pollutants . . . at or from

premises owned, rented, or occupied by [the insured]." The term "pollutants" is defined broadly as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed."

¶ 37. Frontier argues in its brief-in-chief that National Farmers has the burden to demonstrate that the exclusion is applicable and that National Farmers failed to meet this burden. Frontier notes that United has not alleged what contaminated the property. And, Frontier asserts, National Farmers made no attempt in the circuit court to establish that the alleged contamination was caused by a substance fitting the policy definition of a "pollutant." Therefore, Frontier asserts, we cannot determine on the basis of United's allegations whether the contamination was caused by a "pollutant." In addition, Frontier argues that National Farmers failed to establish that there was any "discharge, dispersal, release, or escape" of such a pollutant.

¶ 38. The insurers in their response brief do not dispute that National Farmers has the burden to demonstrate the applicability of the exclusion. Rather, they point out that United's complaint alleges "contamination" and that the policy definition of "pollutant" includes any "solid, liquid, gaseous, or thermal irritant *or contaminant*" (emphasis added). The insurers further point out that the contract between Frontier and United limits Frontier's liability to United for environmental liability to "discharges" occurring while Frontier owned the property. Thus, argue the insurers, National Farmers has no obligation to Frontier under any of the policies containing the pollution exclusion.

770

¶ 39. The insurers' more specific arguments dispose of the general assertions in Frontier's brief-in-chief, and Frontier ignores the topic in its reply brief. We take this lack of reply as a concession by Frontier that the pollution exclusion removes coverage and, therefore, do not address the merits of the insurers' arguments. *See Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (lack of response may be taken as a concession). Thus, with respect to the National Farmers policies that include a pollution exclusion, we accept Frontier's concession that the exclusion applies to remove coverage.[11]

## Conclusion

¶ 40. We conclude that the circuit court erred in granting summary judgment to Frontier's insurers and dismissing them from United's breach of contract action. Based on the allegations in the complaint, we cannot conclude that Frontier's policies do not provide coverage, with the exception of the National Farmers policies containing pollution exclusions. Accordingly, we

---

[11] The insurers also argue that an "alienated property" exclusion in the Tri-State policies removes coverage. Those policies contain an exclusion removing coverage for "property damage to premises alienated by you arising out of such premises or any part thereof." The insurers' argument with respect to this exclusion is again based on the premise that the pertinent event for determining the existence of an "occurrence" was Frontier's alleged breach of contract. They assert: "The property at issue was alienated fifteen years before the alleged breach. Accordingly, the Tri-State policies' alienated property exclusions exclude liability for this claim." (Record citation omitted.) We have already rejected the premise for this assertion. *See supra,* ¶ 12. Thus, we address the alienated property exclusion no further.

reverse the circuit court's order granting summary judgment to the insurers and remand for further proceedings.

*By the Court.*—Order reversed and cause remanded for further proceedings.